**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No. 3:26-cv-971**

| | |
|---|---|
| COMPASS, INC. and COMPASS CAROLINAS, LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>CAROLINA MULTIPLE LISTING SERVICES, INC., d/b/a CANOPY MLS,<br><br>*Defendant*. | **COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked across the areas in which Defendant Carolina Multiple Listing Services, Inc., d/b/a Canopy MLS ("Canopy MLS"), has active listings, because of rules set and enforced by Canopy MLS. Each of the 17 voting directors listed on Canopy MLS's website works for a real estate brokerage, the majority of whom work for brokerages that compete directly with Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 to stop Canopy MLS's anticompetitive behavior.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass Carolinas, LLC (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of Canopy MLS. Under North Carolina and South Carolina law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sells the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as Canopy MLS requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. Canopy MLS, one of the largest MLSs in the country by subscriber count, with more than 22,000 subscribers and active listings, is a combination of Compass' direct competitors,

and it is controlled by a Board of Directors dominated by Compass' direct competitors.[1] Under the Canopy MLS rules, once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media—even without an address, or in a private group—or publicly markets the home in any way Canopy MLS defines as "public marketing," the listing must be given to Canopy MLS and its co-conspirators within one business day, and the agent and homeowner must follow the many restrictions in Canopy MLS's 56-page rulebook—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the Canopy MLS rules.[2]

5. Although North Carolina law states that, as agents, real estate agents owe their clients fiduciary duties and must follow their lawful instructions,[3] if a real estate agent follows the client's lawful instruction to publicly market a home outside of Canopy MLS, the agent then faces an immediate $500 fine for each violation, a $300 noncompliance fine reassessed every two days until the listing is submitted, a mandatory disciplinary hearing after more than three sanctions in a year, fines of up to $15,000, suspension, or termination from the very MLS they need to do business.[4] More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[5] That is what Canopy MLS has done.

---

[1] AJ LaTrace, *New Canopy MLS CEO Promises Continuity, Not Major Changes*, Inman Real Estate News (July 31, 2026).

[2] *See* Canopy MLS, *Rules and Regulations* §§ 1.1, 1.1.1, 1.1.2 & n.2 (rev. Sept. 2026) ("Canopy Rules"); Kyle Murphy, *When Is a Listing Required to Be Submitted to Canopy MLS?*, Canopy MLS Support (June 4, 2026), https://support.canopymls.com/kb/article/719-when-is-a-listing-required-to-be-submitted-to-canopy-mls.

[3] *See Cummings v. Carroll*, 379 N.C. 347, 375–76 (2021); N.C. Real Estate Comm'n, 2021–2022 General Update Course § 3 (Broker Fiduciary Duties); *see also* S.C. Code § 40-57-350.

[4] Canopy MLS Rules and Regulations §§ 8 & n.2, 9.4.3, 9.5, 9.6; Canopy MLS, Clear Cooperation FAQs at 8 (last updated Aug. 20, 2024) ("CCP FAQs").

[5] FTC, The Residential Real Estate Brokerage Industry ("Butters Report") at 130 (Dec. 1983).

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what Canopy MLS is doing: using control of a home listing database that real estate agents in Canopy MLS's service area cannot work without, Canopy MLS and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, Canopy MLS has ignored Compass' demand that it stop fining agents for publicly marketing listings outside the MLS and has sued Compass in New York seeking a declaration that its rules are lawful.[6] Canopy MLS's excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues Canopy MLS claims will result from pre- or off-MLS public marketing have not transpired. Until 2020, Canopy MLS allowed sellers to withhold their listings from the MLS, receiving 10 to 13 "Certification to Withhold" forms a day. But now, in its lawsuit against Compass, Canopy MLS claims "transparency" and "free-riding." Canopy MLS does not care about homeowners; it is a members-only database that fines agents just for following their client's lawful public marketing instructions. Moreover, Compass does not "free ride" as Canopy MLS claims; it pays Canopy MLS dues, and it is a significant contributor of listings to Canopy MLS.

8. Canopy MLS and its co-conspirators have caused substantial economic harm to Compass and its agents, in addition to the immense harm Canopy MLS has caused to homeowners.

---

[6] Am. Compl. ¶¶ 1, 55–57, 109–113, *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 28 ("Canopy FAC").

Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm Canopy MLS and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like Canopy MLS's foreclosed the option for Compass' agents to publicly market a home without giving it to Canopy MLS, thus forcing them to follow Canopy MLS's policies. Because Compass is subject to Canopy MLS's rules, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by Canopy MLS's illegal rules, must be paid back in triplicate and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[7] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[8] As the FTC observed, the people who control the MLS "control . . . the most important aspects of brokerage practices."[9] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

---

[7] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[8] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

[9] Butters Report at 15.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that set commission rates.[10] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[11] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[12]

11. Canopy MLS is one of the largest MLSs in the country, with more than 22,000 real estate professional subscribers—competing brokers and agents—and active listings in 122 counties across North Carolina, South Carolina, Georgia, Tennessee, and Virginia.[13] Canopy MLS is governed by a Board of Directors dominated by those competitors. In fact, each of the 17 voting directors listed on Canopy MLS's website works for a real estate brokerage, the majority of whom work for brokerages that compete with each other and with Compass and its agents.[14]

12. For decades, Canopy MLS has been an unavoidable and dominant feature of residential real estate brokerage in its territory. Participation in Canopy MLS is essential for any

---

[10] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

[11] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[12] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

[13] Canopy FAC ¶ 34.

[14] Canopy MLS, 2026 Canopy MLS Board of Directors, https://www.carolinahome.com/canopymls/leadership/bod (visited Nov. 2, 2026) ("2026 Board Roster").

real estate agent to work in many areas of the Charlotte area, upstate South Carolina, and western North Carolina; real estate agents in those areas cannot effectively represent clients in those areas without being members of Canopy MLS subject to its rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing Canopy MLS's incredible market power, agents must follow Canopy MLS's rules or Canopy MLS will fine and punish them, potentially by exclusion from Canopy MLS. Canopy MLS polices its members through compliance staff that monitor how its members (who are competitors) represent their clients. Canopy MLS encourages competing agents to report to Canopy MLS any rule violations by their competitors for punishment, and it will, on request, process those complaints without revealing the complainant's identity.[15] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because Canopy MLS membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. Canopy MLS Rules 1.1 and 1.1.2 specifically block competition among brokers and agents, and homeowner choice. Rule 1.1 forces homeowners, brokers, and agents to give Canopy MLS their listings and forces them into all of the Canopy MLS restrictions. Every exclusive right-to-sell and exclusive agency listing in the Canopy MLS service area must be submitted to Canopy MLS, and, under Rule 1.1.1, it must be submitted within one business day of the listing's effective or marketing date. Before then, no one—not the seller, and not even other

[15] Canopy MLS Rules §§ 9, 9.4; CCP FAQs at 4, 7 (directing agents to report issues that are "not necessarily . . . violation[s]" and listing the documentation reporting brokers should submit).

agents in the listing firm—may preview or show the property unless the listing is a "Firm Exclusive." One of those restrictions, Rule 1.1.2, dictates how a homeowner can publicly market their property. Unless they give the listing to Canopy MLS within one business day, homeowners and agents may not market the property to the public, which Rule 1.1.2 defines to include flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays, email blasts, and multi-brokerage listing-sharing networks and applications available to the general public. Canopy MLS treats even a social-media post that omits the address, photographs posted without an address, and a post in a private social-media group as public marketing.[16] Even though Canopy MLS does not own the home or represent the homeowner, Canopy MLS is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how Canopy MLS directs (a choice between two extremes: listing it immediately through an MLS and incurring the disadvantages described above; or not publicly marketing the home at all). Through these rules, Canopy MLS and its co-conspirators control how homeowners and agents market properties on-Canopy MLS and outside-Canopy MLS. Canopy MLS and its co-conspirators, thus, control home marketing across the entire real estate industry in much of the Charlotte region and the western Carolinas.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing,

---

[16] Canopy MLS Rules §§ 1.1, 1.1.1, 1.1.2; Canopy MLS, *When is a listing required to be submitted to Canopy MLS?* at 1–2 (last updated June 4, 2026) ("KB 719").

it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. Phase One is blocked, and Phase Two is severely restricted, by Canopy MLS rules: Phase One listings cannot be publicly marketed, and Phase Two Coming Soon listings have severe restrictions on what the homeowner and agent can do. Specifically, Canopy MLS states that even if the homeowner wants their agent to show buyers the property, a home in "Coming Soon-No Show" status may not be shown to anyone or held open, and may be promoted only as "coming soon"; the listing must first be entered into Canopy MLS, which sends it to IDX, VOW, and syndication websites and apps, so the homeowner cannot limit a Coming Soon listing to selected websites; and a listing cannot be moved into Coming Soon from any other status.[17] Canopy MLS states that all Coming Soons must be restricted to 21 days, even if the homeowner wants their home listed as a Coming Soon for longer.[18]

18. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the ***homeowner's*** sales pitch to buyers) the history of price changes

---

[17] Canopy MLS Rules § 1.12.2(d)(iv), (vi), (vii) & n.8; Kyle Murphy, *Coming Soon-No Show (CSNS) Status*, Canopy MLS, (last updated Apr. 24, 2026) ("KB 87"); Kyle Murphy, *Coming Soon Do's and Don'ts*, Canopy MLS, (last updated Apr. 24, 2026) ("KB 322"); Canopy MLS, Seller Authorization for Limited Marketing (v. 7_2026) at 1, Canopy FAC Ex. F, ECF No. 28-6 ("Seller Authorization Form").

[18] Canopy MLS Rules § 1.12.2(d)(v); Seller Authorization Form at 1.

and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise and control Canopy MLS) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

19. This unreasonably restrains trade in two ways. Canopy MLS's agent members, including its Board members, compete directly with one another and with Compass' agents for homeowners, and Canopy MLS Rules 1.1 and 1.1.2 block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[19] Moreover, Canopy MLS is blocking competition

[19] Butters Report at 130.

between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why Canopy MLS Rules 1.1 and 1.1.2 violate the law. As recognized by the FTC, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed for over 50 years.[20] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs Canopy MLS,[21] expressly provides that an "***MLS shall not: Make any rule regulating the advertising or promotion of any listing***,"[22] and preserves an alternative to the MLS, which it calls an "office exclusive."[23] Before Canopy MLS Rule 1.1.2, Canopy MLS had no restrictions on how withheld listings were publicly marketed. In fact, until 2020, Canopy MLS accepted a form titled "Certification to Withhold," and it received 10 to 13 of those forms from sellers every day.[24] But today, Canopy MLS discourages brokers from accepting office exclusives at all—precisely what the Fourteen Points forbid.[25]

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings" as required by rules like Canopy MLS Rule 1.1. "Where 'office exclusives' are allowed, that is,

---

[20] *Id.* at 129–30.

[21] Canopy MLS Bylaws art. XI, § 1 (Jan. 2026) ("Bylaws"); Canopy MLS Rules § 14 (NAR-mandated rule changes are incorporated automatically, without a Board vote). Canopy MLS also admits "MLS-only" participants who are not Realtors®. Bylaws art. IV, § 1(a).

[22] Butters Report at 134 n.354 (emphasis added).

[23] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[24] Canopy MLS, Clear Cooperation update story (Mar. 28, 2023) (republishing 2020 article) ("KB 820"); *see also* Canopy MLS, 07/29/2020 – Answers to Clear Cooperation Questions (last updated Sept. 10, 2020) ("KB 407").

[25] KB 820 (Canopy MLS compliance staff stating that Canopy MLS discourages brokers from accepting Firm Exclusives unless that is the only way to satisfy a seller's goals).

where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[26] Canopy MLS Rules 1.1 and 1.1.2 violate the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to Canopy MLS's Rule 1.1.2 that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[27] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[28]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of Canopy MLS's combination of competitors have forced upon the industry. But Canopy MLS blocks that choice and the competition that choice would bring.

23. Canopy MLS and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot benefit from the fiduciary duties agents owe to their clients.

---

[26] Butters Report at 130.

[27] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[28] Butters Report at 130.

24. Canopy MLS has no valid justifications for its illegal conduct. Any claim Canopy MLS makes is undermined by recent history: until 2020, Canopy MLS allowed agents and their clients to market pre- and off-MLS without fines, Canopy MLS succeeded, and homes were legally sold throughout the Charlotte region. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. Canopy MLS's restraints on competition are not about "transparency." Canopy MLS does not allow homeowners or homebuyers to become members, and they can see its listings only through its members. Canopy MLS does not accept for-sale-by-owner listings: every listing must belong to a brokerage and be subject to an exclusive listing agreement. Canopy MLS's own rules allow listings to be hidden—as Firm Exclusives visible only within the listing brokerage, or never entered into the MLS at all—just as long as they are not publicly marketed outside of Canopy MLS.[29] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[30] Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, Canopy MLS sends listings, through data feeds, to syndication websites and other companies that do not contribute any listings.[31]

25. Compass hereby brings claims against Canopy MLS for violating the Sherman Act, 15 U.S.C. § 1.

---

[29] Bylaws art. IV, §§ 1–3; Canopy MLS Rules §§ 1(b), 1(d), 1.2.1 & n.2; Seller Authorization Form at 2–3.

[30] *Realcomp II, Ltd.*, 635 F.3d at 835.

[31] Canopy MLS Rules § 1.1.3 & app. A (MLS Grid IDX Rules); KB 87.

## PARTIES

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including North Carolina and South Carolina. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including North Carolina and South Carolina.

27. Plaintiff Compass Carolinas, LLC is a Delaware limited liability company with its headquarters at 4525 Sharon Road, Third Floor, Charlotte, North Carolina 28211. It is registered with the North Carolina Secretary of State to transact business in North Carolina, where it operates a real estate brokerage under the "Compass" brand and is licensed as a real estate firm by the North Carolina Real Estate Commission. Compass Carolinas, LLC is an indirect wholly owned subsidiary of Compass, Inc.[32]

28. Defendant Carolina Multiple Listing Services, Inc., d/b/a Canopy MLS, is a North Carolina corporation with its principal place of business in Charlotte, North Carolina at 1120 Pearl

[32] N.C. Sec'y of State, Application for Certificate of Authority of Compass North Carolina, LLC (filed Oct. 8, 2018); N.C. Sec'y of State, 2026 Annual Report of Compass Carolinas, LLC (filed Apr. 6, 2026).

Park Way, Charlotte, NC 2820.[33] Canopy MLS is a wholly owned subsidiary of Charlotte Regional REALTOR® Association, Inc., d/b/a Canopy REALTOR® Association (the "Association").[34] Canopy MLS has more than 22,000 subscribers, and others access its data through data-sharing agreements with other MLSs, including through the Southeast MLS Alliance with Georgia MLS, and Realtracs.[35] Each of the 17 voting directors listed on Canopy MLS's website works for a real estate brokerage, the majority of whom work for brokerages that compete with each other and Compass and its agents.

29. Canopy MLS is a contract, combination, or conspiracy of competing agents and brokers. Canopy MLS's participating brokers and agents compete directly with one another and with Compass for homeowner clients, homebuyer clients, and agents. Those brokers and agents follow and enforce Canopy MLS's rules, and Canopy MLS is governed by a Board of Directors dominated by competing brokers and agents.

30. Canopy MLS's Bylaws define the "service area" within which Canopy MLS functions as any area in which a participant or subscriber may be able to effectively deliver service to a potential client or customer, and Canopy MLS Rule 1.1 requires submission of every covered listing located within that service area.[36] In practice, Canopy MLS has active listings in 122 counties across five states, concentrated in the Charlotte region and western North Carolina.[37]

---

[33] Canopy FAC ¶ 12; Bylaws art. I.

[34] Bylaws arts. I, XIII; Canopy FAC ¶ 12.

[35] Canopy FAC ¶ 34; *Southeast MLS Alliance Unites Largest Multiple Listing Services in Georgia, North Carolina, Tennessee, and South Carolina*, Canopy MLS, https://www.canopyrealtors.com/southeast-mls-alliance (Oct. 2, 2023).

[36] Bylaws art. III; Canopy MLS Rules §§ 1.1, 1.2(b).

[37] Canopy FAC ¶ 34.

Moreover, Canopy MLS is the only MLS in Charlotte and portions of upstate South Carolina and western North Carolina.

**DEFENDANT'S CO-CONSPIRATORS**

31. Competing agents, including those enforcing Canopy MLS's rules, members of Canopy MLS's Board of Directors, and members of the Canopy MLS Professional Standards Committee, conspired with each other, with Canopy MLS, and with Canopy MLS's owner, the Association, to design, approve, enforce, and implement Canopy MLS Rules 1.1 and 1.1.2. Canopy MLS's President appoints its committees, with the Board's approval, and contested violations are heard by panels drawn from the Professional Standards Committee, whose members are Canopy MLS participants and subscribers—that is, competing brokers and agents. Appeals go to the Executive Committee, composed of Canopy MLS's officers and immediate Past President, with the chief executive officer as a non-voting member.[38] The Association selects or influences the selection of Canopy MLS's Board of Directors. Canopy MLS's President, Secretary, and Treasurer are the same persons as the Association's officers, selected under the Association's bylaws, and all of Canopy MLS's officers must be Realtor® members of the Association. The Association appoints six directors, its Nominating Committee serves as Canopy MLS's Nominating Committee, and only that committee's nominees appear on the ballot, in an election held concurrently with the Association's. Five other Realtor® associations—the Land of the Sky Association of REALTORS®, the Hendersonville Board of REALTORS®, the Central Carolina Association of REALTORS®, the Gaston Association of REALTORS®, and the Union County Association of REALTORS®—each appoint a director. The Board owes its primary duty of

[38] Bylaws art. VI, § 2(b); Canopy MLS Rules §§ 9.7, 9.8, 9.13, 9.14.

loyalty to the Association, submits its budget to the Association's board, and cannot sell Canopy MLS without the Association's approval, and Canopy MLS's remaining assets pass to the Association if it dissolves.[39] Realtor® association staff may file complaints of rule violations, and complaints of unethical conduct by Realtor® members are referred to the Association's Grievance Committee. As recently as 2020, the Association and Canopy MLS shared a chief executive officer, and in 2025 Canopy MLS's President announced changes to its Clear Cooperation rule in a video posted by the Association.[40]

32. Canopy MLS's co-conspirators performed acts and made statements in furtherance of Canopy MLS's anticompetitive conduct. Canopy MLS is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

## JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from Canopy MLS's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

33. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

34. This Court has personal jurisdiction over Canopy MLS because its headquarters and principal place of business are in this district, and Canopy MLS conducts substantial business in this district.

---

[39] Bylaws art. VI, §§ 1, 4(f), 5, arts. XII, XIII.

[40] Canopy MLS Rules §§ 9, 9.2; KB 407; KB 719 at 4.

35. Venue is appropriate in this District and in the Charlotte Division because Canopy MLS's headquarters and principal place of business are in Charlotte, Mecklenburg County, North Carolina, and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this District. 28 U.S.C. § 1391; 15 U.S.C. § 22. Canopy MLS was organized as a North Carolina corporation in 1991 and lists its principal office in this District in its filings with the North Carolina Secretary of State.

## TRADE AND COMMERCE

36. Canopy MLS has entered into agreements with each of its more than 22,000 subscribers and facilitates the sale of tens of thousands of residential homes and condominiums each year—its total closed sales exceeded 43,000 in 2025 in the Charlotte region alone—with total closings valued in at least the tens of billions of dollars.[41] These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

37. Relevant Product Markets. There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

---

[41] Bylaws art. IV, § 3(b); Canopy MLS Rules § 8.1; Canopy FAC ¶ 34; *Local Market Update for December 2025*, Canopy MLS, https://marketstatsreports.showingtime.com/CRRA_kcohd/sst/202512/Charlotte-Region.pdf.

38. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control Canopy MLS compete in the Brokerage Services Market.

39. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control Canopy MLS compete in the Agent Services Market.

40. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing

services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Canopy MLS participates in the MLS Market.

41. Relevant Geographic Market. The relevant geographic market for each of the defined product markets is no larger than the area in which Canopy MLS's participants list and sell homes, centered on the Charlotte region and western North Carolina (the "Canopy MLS service area").[42] A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Brokers and agents cannot avoid Canopy MLS's rules by using a neighboring MLS or an MLS with a data sharing agreement with Canopy MLS for several reasons:

(a) Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

(b) Because Canopy MLS's Bylaws define its service area as any area in which a participant or subscriber may be able to effectively serve a client, Rule 1.1's submission requirement reaches listings wherever a Canopy MLS participant does business.[43]

(c) Canopy MLS rules apply to all agents and listings affiliated with a "Member Participant," which means that every listing by an agent affiliated with a brokerage must be given to Canopy MLS. Even if the brokerage has only a single agent who

---

[42] Canopy FAC ¶ 34; Bylaws art. III.

[43] Bylaws art. III; Canopy MLS Rules § 1.1.

needs to access Canopy MLS, the entire brokerage must become a member. Specifically, all listings taken by Member Participants are subject to Canopy MLS's rules; every licensee affiliated with a Member Participant must subscribe to Canopy MLS or obtain a waiver; each Member Participant pays for a subscription for each affiliated licensee; and the Member Participant is responsible for every affiliated person's compliance with the rules.[44] Thus, if one agent in a brokerage needs Canopy MLS access, then all agents in that brokerage are bound by Canopy MLS's rules.

42. To serve their clients and compete in the Canopy MLS service area, brokers and agents must have access to Canopy MLS and follow Canopy MLS's rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the Canopy MLS rules collectively have market power. In the MLS Market, Canopy MLS has market power.

43. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[45] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . .

---

[44] Canopy MLS Rules §§ 1.1.1, 7.1, 8.1, 11.2; Bylaws art. IV, § 3.

[45] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), *reprinted in* 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[46]

## FACTUAL ALLEGATIONS

### *MLSs and the Antitrust Laws*

44. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. Canopy MLS is in the business of operating a broker cooperative by:

(a) enhancing cooperation among its Member Participants and Subscribers;

(b) accumulating and disseminating listing information so that Member Participants and Subscribers can prepare appraisals, analyses, and valuations of real property for clients and customers;

(c) correlating and disseminating listing information among Member Participants and Subscribers so they may better serve their clients and the public;

(d) giving subscribers' clients and customers limited access to listing data, by invitation, through systems and apps provided by Canopy MLS; and

(e) distributing listing data to brokerage and syndication websites and apps through IDX, VOW, and syndication data feeds.[47]

---

[46] DOJ & FTC, Competition in the Real Estate Brokerage Industry 12 (Apr. 2007) ("2007 DOJ/FTC Report"), available at https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[47] Bylaws art. II; Seller Authorization Form at 2; KB 87; Canopy MLS Rules § 1.1.3 & app. A.

45. MLSs also make and enforce rules. Canopy MLS explains how competing agents can help enforce Canopy MLS's rules, and it provides a specific process and email address to report violations of Canopy MLS Rule 1.1.2.[48]

46. In addition to operating this members-only database, some MLSs, like Canopy MLS, sell or license agent and homeowner data to third parties, such as real estate web portals and technology vendors, which monetize it in various ways, *e.g.*, selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages.[49]

47. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are comprised of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

48. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently

---

[48] Canopy MLS Rules § 9.4; CCP FAQs at 4, 7; KB 820; KB 719 at 4 (directing questions to compliance@canopyrealtors.com).

[49] Canopy MLS Rules § 12 & apps. A–B (MLS Grid IDX and VOW rules and data license).

pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. MLSs wield the unique power to fine and punish their own members.

49. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[50] As the FTC wrote, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[51] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

50. In the 1940s, the DOJ brought civil and criminal charges against MLSs that set commission rates.[52] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[53] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[54]

---

[50] *Realty Multi-List*, 629 F.2d at 1370.

[51] Butters Report at 92–93.

[52] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.

[53] *Realcomp II, Ltd.*, 635 F.3d at 819.

[54] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

51. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies . . . have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[55] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[56]

52. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC explained:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[57]

53. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[58] Specifically, the antitrust policy expressly provided that "***MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'***"[59] Point 10 provided that "***MLS shall not: Make any rule regulating the***

---

[55] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II*, 635 F.3d 815.

[56] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[57] Butters Report at 109.

[58] *Id.* at 130.

[59] *Id.* at 134 n.354 (emphasis added).

***advertising or promotion of any listing.***"[60] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[61] The term "office exclusive" just meant the listing was not provided to the MLS. Therefore, Canopy MLS's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid Canopy MLS's restrictions or market their homes how they choose under Canopy MLS Rules 1.1 and 1.1.2.

***Canopy MLS Rules 1.1 and 1.1.2***

54. Canopy MLS's rules are approved by its Board of Directors, and the majority of the voting directors listed on Canopy MLS's website work for brokerages that compete with Compass. Any change to the rules, other than a change mandated by NAR or by Canopy MLS's data-distribution vendor, MLS Grid, requires a majority vote of the directors present and voting. Canopy MLS's President—who is also the Association's President—appoints its committees, including the Professional Standards Committee whose members sit on the hearing panels that decide contested violations, with the Board's approval. A respondent may appeal a hearing panel's decision only to the Executive Committee, composed of Canopy MLS's officers and immediate Past President.[62]

55. Rule 1.1 provides that all exclusive right-to-sell and exclusive agency listings within the Canopy MLS service area, other than optional listings, must be submitted to Canopy

---

[60] *Id.* (emphasis added).

[61] *Id.* at 130.

[62] Canopy MLS Rules §§ 9.7, 9.8, 9.13, 9.14; Bylaws art. VI, §§ 2–4, art. VII, § 1, 2026 Board Roster.

MLS, and Rule 1.1.1 requires submission within one business day of the listing's effective date (or the later "Marketing Date" in North Carolina or the start of the listing term in South Carolina). Rule 1.1.2 dictates how homeowners can publicly market their properties. Unless they give the listing to Canopy MLS within one business day, agents and homeowners may not market the property to the public, which Rule 1.1.2 defines to include flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), email blasts, and multi-brokerage listing-sharing networks and applications available to the general public.[63] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

56. If a Canopy MLS Participant violates Canopy MLS's rules, Canopy MLS can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[64] Pursuant to Canopy MLS's "Compliance Fine Schedule," a violation of Canopy MLS Rule 1.1.2 is a "Category III" violation punishable by an immediate $500 fine for the first and each additional violation; a $300 noncompliance fine if the listing is not submitted within two business days, which Canopy MLS reassesses every two days until the agent complies; and $200 nonpayment fines every 30 days until the fines are paid.[65] Canopy MLS staff impose the fine by sending an immediate fine notice, without a hearing. To contest a fine, the agent must first pay it, post an appearance deposit, and obtain the signature of the brokerage's Member Participant, who must attend the hearing. A hearing panel cannot reduce the fine: if it finds a violation, "the fine

---

[63] Canopy MLS Rules §§ 1.1, 1.1.1, 1.1.2 & n.1; KB 719 at 1–2.

[64] Canopy MLS Rules §§ 8, 9.6.

[65] Canopy MLS Rules §§ 9.4.3, 9.5, 9.6; CCP FAQs at 8.

stands."[66] Canopy MLS thus punishes public marketing far more harshly than nearly every other rule violation: it places public marketing in the same category, with the same $500 fine, as entering a home without authorization and failing to safeguard lockbox keys, and it fines public marketing five times as much as Category II violations such as entering a listing without a signed listing agreement. The only violations Canopy MLS punishes more harshly—showing a home in Coming Soon status and unauthorized use of an electronic lockbox key—are Category IV violations. Canopy MLS has also increased the fine for violating its Clear Cooperation rule fivefold since it adopted the rule, from $100 as a Category II violation to $500 as a Category III violation.[67] Canopy MLS Rule 8 also gives Canopy MLS discretion to impose fines of up to $15,000, suspension for up to one year, and termination for up to three years, and it requires any agent with more than three Category II or III sanctions in a calendar year to attend a disciplinary hearing, along with the brokerage's Member Participant.[68] Canopy MLS polices its rules, as do Canopy MLS's members.

***See It First™ on Compass***

57. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available

---

[66] Canopy MLS Rules §§ 9.7(b)–(c), 9.12.

[67] Canopy MLS Rules §§ 8, 9.4.2–9.4.4, 9.5; Canopy MLS, *A Guide to Clear Cooperation for Photographers, Home Stagers and Vendors* ("Vendor Brochure"); CCP FAQs at 8.

[68] Canopy MLS Rules § 8 & n.2.

to other participants in the MLS and may be posted to an agent's website or to other selected websites.

58. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients where MLS rules permit it, although Canopy MLS impedes that competition to protect its members, who are Compass' competition.

59. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[69] acknowledging that the listing will not initially appear in the active MLS feed.

60. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

---

[69] These disclosures are available at https://www.compass-homeowners.com.

61. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

62. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

63. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

64. The phased marketing strategy has several advantages for homeowners.

65. ***First,*** because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative

to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

66. ***Second***, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

67. ***Third,*** MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

68. ***Fourth,*** pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

69. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer

within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals.

70. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy had 34% fewer days on the MLS and experienced 29% fewer price cuts. Additionally, properties sold for 4.6% more. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

71. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to Canopy MLS's Rule 1.1 and Rule 1.1.2 in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[70]

[70] *Zillow Group, Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-05451, Mem. Op. & Order 43–44 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

72. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

***Anticompetitive Effects***

73. Canopy MLS Rules 1.1 and 1.1.2 restrain trade in several ways.

74. ***First***, because Canopy MLS's participating brokers and agents (including Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of Canopy MLS Rules 1.1 and 1.1.2 block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[71]

75. ***Second***, Canopy MLS is blocking competition by other public marketing methods, identified by Canopy MLS Rule 1.1.2 as flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), email blasts, and multi-brokerage listing-sharing networks and applications available to the general public, and most significantly the Compass website itself.

76. ***Third***, Canopy MLS Rules 1.1 and 1.1.2 also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

---

[71] Butters Report at 130.

77. ***Fourth***, Canopy MLS Rules 1.1 and 1.1.2 further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

***Canopy MLS's Justifications Are Pretextual***

78. Canopy MLS has no valid justification for its illegal conduct. Canopy MLS operated without Rule 1.1.2 until 2020, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by Canopy MLS or prohibit its members from selectively editing or excluding the Canopy MLS listings they show their buyer clients. Canopy MLS Rules 1.1 and 1.1.2 govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

79. Canopy MLS's restraints on competition are not about "transparency." Canopy MLS does not allow homeowners or homebuyers to become members, and they can see its listings only through its members. Canopy MLS does not accept for-sale-by-owner listings. And Canopy MLS's own rules allow listings to be hidden, just as long as they are not publicly marketed.[72] Nor are Canopy MLS's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

---

[72] Canopy MLS Rules §1.2.1 & n.2; Seller Authorization Form at 2–3.

80. Canopy MLS's restraints also have nothing to do with "free-riding." In its lawsuit against Compass, Canopy MLS has accused Compass of "free riding" on the MLS by using other brokers' listing data while withholding its own publicly marketed listings, and has argued that submitting a listing after the home sells comes too late.[73] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, ***every*** member of Canopy MLS will be free to offer pre- and off-MLS marketing strategies to their clients.

81. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass provides value to Canopy MLS and its members in three critical ways: (1) by exposing its buyer clients to listings submitted by other members; (2) by submitting listings to Canopy MLS post-sale even when they were not previously submitted to Canopy MLS, adding to the body of information that members use for advising clients on pricing and other matters; and (3) by submitting listings to Canopy MLS for the benefit of all buyer agents in the Canopy MLS service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere. Compass is also one of the largest contributors of listings to Canopy MLS.

82. In its lawsuit and on its website, Canopy MLS has asserted other arguments about the purported drawbacks of pre- and off-MLS marketing that amount to little more than paternalistically telling homeowners and their agents what is best for them. Canopy MLS tells agents that maximizing exposure is in the best interest of most sellers, tells brokers it is their job

---

[73] Canopy FAC ¶¶ 55–56.

to find out why a seller does not want the listing in the MLS, and requires every seller who chooses a limited-exposure option to sign an acknowledgment that reduced exposure "reduces competition for the property."[74] Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

83. Canopy MLS's purported alternatives do not cure the restraint. Canopy MLS Rule 1.2.1, which governs what Canopy MLS calls a "Firm Exclusive" (an office exclusive), requires that the property be kept hidden and marketed exclusively within the listing brokerage—no yard sign, no website, no social media post, no email blast, and no multi-brokerage communication. Even then, the listing must be registered with Canopy MLS within two business days, the seller must certify that no one—not the seller, the brokerage, or anyone else—will publicly market it, and if anyone does, the listing must be submitted to Canopy MLS within one business day. Canopy MLS's "Limited Exposure" option requires the listing to be entered in Canopy MLS and shown to all of its subscribers, and Canopy MLS's seller form bars the broker from marketing a Limited Exposure listing anywhere on the internet, including on social media and the brokerage's own website—even though Rule 1.1.3 itself says the broker may market the property in any manner the seller approves. Canopy MLS's "Coming Soon-No Show" status lasts at most 21 days, bars all showings and open houses, and requires the listing to be entered in Canopy MLS and syndicated across the internet. And once a seller broadens a listing's exposure, Canopy MLS will not let the seller return to limited exposure or remove the listing from the MLS. None of these options lets a homeowner publicly market a home before, or without, submitting it to Canopy MLS.[75]

---

[74] Canopy FAC ¶¶ 1, 55–57; KB 719 at 2–3; KB 820; Seller Authorization Form at 4.

[75] Canopy MLS Rules §§ 1.1.2 & n.1, 1.1.3, 1.2.1 & n.2, 1.12.2(d); Seller Authorization Form at 1–4; KB 719 at 2–3; KB 87. The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. *Cf.* Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network,*

***Antitrust Injury to Compass, Its Agents, and Homeowners***

84. Canopy MLS's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

(a) **Lost Commissions and Financial Harm to Brokerage**: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

(b) **Degradation of Compass Website**: The enforcement of Canopy MLS Rules 1.1 and 1.1.2 degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

(c) **Depressed Sales Prices and Lost Sales**: By eliminating Compass' ability to pre-market and test pricing, Canopy MLS rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

(d) **Excessive Days on Market and Public Price Drops**: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

---

*Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). Canopy MLS Rule 1.2.1 is precisely the sort of "exception" that makes Canopy MLS Rules 1.1 and 1.1.2 anticompetitive.

(e) **Lost Agents**: Canopy MLS Rules 1.1 and 1.1.2 prevent Compass from competing against other brokerages for agents by offering agents innovative pre-marketing strategies that they can offer their clients.

(f) **Loss of Convenience and Harm to Innovation**: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

85. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by Canopy MLS and the agents and brokerages who control it. Canopy MLS's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that Canopy MLS Rules 1.1 and 1.1.2 foreclose, Canopy MLS's rules prevent Compass from offering phased marketing to homeowners and agents in the Canopy MLS service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: Canopy MLS's rules prevent Compass from offering homeowners and agents innovative strategies they want.

86. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from Canopy MLS's rules and their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

***Canopy MLS's Rule Enforcement Against Compass***

87. Canopy MLS has issued fines to Compass agents for violations of Canopy MLS Rules 1.1 and 1.1.2. By enforcing Canopy MLS Rules 1.1 and 1.1.2 through immediate fine notices, recurring noncompliance and nonpayment fines, mandatory disciplinary hearings, and the threat of suspension and termination from the MLS, Canopy MLS has made it impossible for Compass to perform its obligations in accordance with homeowners' instructions.

88. On August 27, 2026, Compass' Chief Legal Officer, Ethan Glass, emailed Canopy MLS about its enforcement of these rules; Canopy MLS did not respond. On September 14, 2026, Compass demanded that Canopy MLS confirm in writing, by October 6, 2026, that it would not fine or punish real estate professionals for publicly marketing office exclusive listings. Compass followed up on September 18, 2026.[76] On September 29, 2026, Canopy MLS's counsel asked for an extension to November 6, 2026, explaining that counsel needed to consult with "Canopy's stakeholders." Compass extended the deadline to October 13, 2026, and later to October 20, 2026. Canopy MLS never responded to the substance of Compass' demand.[77] Instead, on October 21, 2026, Canopy MLS joined five other MLSs in suing Compass in the United States District Court for the Southern District of New York, seeking a declaration that its rules are lawful under federal law and North Carolina law.[78]

---

[76] Letter from Nathan P. Eimer to Steve Byrd, Chief Executive Officer, Canopy MLS (Sept. 14, 2026), Canopy FAC Ex. M, ECF No. 28-13; Letter from Nathan P. Eimer to Steve Byrd (Sept. 18, 2026).

[77] Emails between Greg Skidmore, counsel for Canopy MLS, and Nathan P. Eimer (Sept. 29–Oct. 2, 2026).

[78] Compl., *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 21, 2026), ECF No. 1; Canopy FAC ¶¶ 12, 109–113.

***Canopy MLS's Continuing Violations***

89. Canopy MLS's anticompetitive conduct is ongoing. Canopy MLS Rules 1.1 and 1.1.2 are not merely rules adopted in the past; they are a continuing agreement among competing brokers to penalize and exclude any broker or agent who follows a homeowner's instruction to publicly market a home outside the MLS, and Canopy MLS enforces that agreement through immediate fine notices, recurring noncompliance and nonpayment fines, mandatory disciplinary hearings before panels of competing brokers, and the threat of suspension and termination.[79]

90. Within the four years before this complaint was filed, Canopy MLS and its co-conspirators have committed new and independent acts that renew the restraint and inflict new and accumulating injury on Compass, including:

(a) issuing new fines against Compass agents for violating Rule 1.1.2;

(b) in August 2025, voting through Canopy MLS's Board of Directors to keep Rule 1.1.2's one-business-day submission requirement in force while changing only its treatment of private one-to-one communications between agents, effective September 8, 2025;[80]

(c) re-adopting Rules 1.1 and 1.1.2, without substantive change, in the versions of Canopy MLS's rules revised January 22, 2026, and in the current version, which Canopy published on September 28, 2026, fourteen days after Compass' September 14, 2026, demand;[81]

---

[79] Canopy MLS Rules §§ 8, 9.4.3, 9.5–9.8, 9.12–9.14.

[80] Canopy MLS, *09/12/2025 – Canopy MLS Board of Directors Approves Policy and System Changes to Expand Seller Listing Options* (last updated Sept. 30, 2025) ("KB 917"); Canopy MLS, *Clear Cooperation Policy Update* (last updated Sept. 19, 2025); KB 719 at 3–4.

[81] Canopy MLS Rules and Regulations §§ 1.1–1.1.2 (rev. Jan. 22, 2026), Canopy FAC Ex. E, ECF No. 28-5; Canopy MLS Rules §§ 1.1–1.1.2, 14.

(d) revising its seller authorization form on August 28, 2025, and again in July 2026, each time preserving the ban on publicly marketing Firm Exclusive listings and, in the current version, barring Limited Exposure listings from all internet marketing;[82]

(e) increasing the fine for violating Rule 1.1.2 from $100 to $500;[83]

(f) seating new directors each January and appointing a Professional Standards Committee of competing brokers to decide alleged violations each year;[84]

(g) refusing Compass' September 14, 2026, demand and, on October 21, 2026, suing Compass to obtain a declaration that it may continue enforcing Rules 1.1 and 1.1.2; and

(h) continuing, each day, to prohibit Compass and its agents from publicly marketing listings in accordance with homeowners' instructions, and to assess fines when they do.

91. Each of these acts required Canopy MLS to make a fresh, discretionary decision to maintain, tighten, or enforce Rules 1.1 and 1.1.2—a decision Canopy MLS was free not to make. Each act caused Compass new injury—lost commissions, lost ancillary revenue, lost agents, and diminished value of its technology platform—that Compass could not have recovered in an earlier action because that injury had not yet occurred. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because Canopy MLS continues to maintain Rules 1.1 and 1.1.2 and to threaten their enforcement today.

---

[82] KB 917; Seller Authorization Form at 2–3.

[83] Vendor Brochure; CCP FAQs at 8; Canopy MLS Rules § 9.5

[84] Bylaws art. VI, § 4, art. VII, § 1; Canopy MLS Rules §§ 9.7–9.8.

## CAUSES OF ACTION

### COUNT I
### PER SE ILLEGAL GROUP BOYCOTT
### IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

92. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

93. The majority of the 17 voting directors listed on Canopy MLS's website work for brokerages that are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

94. Through Canopy MLS Rules 1.1 and 1.1.2, Canopy MLS forces Compass and its agents to forgo either (1) a critical input to their business (access to Canopy MLS in the Canopy MLS service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

95. The agreement by and among Canopy MLS and its governing members to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because Canopy MLS possesses market power in the MLS Market in the Canopy MLS service area; it controls access to an input—MLS participation—that agents need to compete effectively in the Canopy MLS service area; and the challenged rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

96. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## COUNT II

## COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

97. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

98. Canopy MLS is the dominant MLS in the Canopy MLS service area. Membership in Canopy MLS and access to the MLS it operates is critical for agents working in the Canopy MLS service area. Canopy MLS is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. Canopy MLS and the agents and brokerages who control it are using their control of Canopy MLS to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing Canopy MLS Rules 1.1 and 1.1.2, which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

99. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including the option to withhold listings that Canopy MLS offered before 2020 and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

100. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## REQUESTED RELIEF

Compass requests the following:

(a) A trial by jury as to all claims so triable;

(b) A declaration that Canopy MLS Rules 1.1, 1.1.1, and 1.1.2 are an unlawful restraint of trade under 15 U.S.C. § 1;

(c) An injunction prohibiting Canopy MLS from adopting, maintaining, or enforcing Canopy MLS Rules 1.1, 1.1.1, and 1.1.2, or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

(d) An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

(e) An award of Plaintiffs' attorneys' fees and costs of suit; and

(f) Such other relief that the Court deems just and equitable.

Dated: November 12, 2026

By: /s/ *Patrick Grayson Spaugh*

Debbie Harden (N.C. Bar No. 10576)
Debbie.Harden@wbd-us.com
Patrick Grayson Spaugh (N.C. Bar No. 49532)
Patrick.Spaugh@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
301 S. College St., Suite 3500
Charlotte, NC 28202
Telephone: 704-331-4900
Fax: 704-331-4955

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
Brian Y. Chang (*pro hac vice forthcoming*)
bchang@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

*Attorneys for Plaintiff Compass, Inc. and Compass Carolinas, LLC*